Parker C. J.
delivered the opinion of the Court. A forfeiture of the penalty of the bond having been established by *348 a verdict of the jury, which verdict has been sustained by the Court after argument upon the questions of law presented by the report of the case, a hearing in chancery has been sought for and had, in order to ascertain the damages sustained by the plaintiffs by reason of the breach of the condition ; and judgment is now to be entered up for such sum as shall be found due in equity and good conscience, according to the spirit and intent of the contract, as is required by St. 1785, c. 22.
In such suits the judgment of forfeiture of the penalty is little more than formal, and the plaintiff, to entitle himself to any thing more than nominal damages, must show and prove to -the Court the amount and value of the injury he has sustained by a breach of the contract.
The condition of this bond is, that Jabez Chickering, who had been appointed cashier of the Dedham bank, should faithfully discharge the duties of that office, without fraud, covin, concealment, neglect or delay, so long as he should continue in that office ; and should, when a successor should be duly appointed, deliver up to him, on request by the proper authority, all books, papers, and moneys, and every article and thing belonging to said bank, under his care.
It is obvious that both branches of this condition equally respect the duties of Chickering as cashier of the bank; so that it is necessary for the plaintiffs to prove some unfaithful or negligent conduct in that office, whereby the damages sought to be recovered accrued, or some refusal to deliver up books, papers, money, or some other article or thing, committed to his care as cashier of the bank.
In order to entitle themselves to judgment within this rule, the plaintiffs have specified divers charges against Chickering as cashier, and have endeavoured to prove them by the evidence which is reported by the auditor, before whom a minute and accurate examination of evidence and investigation of facts took place.
The facts contained in that report have been the basis of the inquiry before us, and we proceed to declare our opin on of the effect of those facts upon the several claims of the plaintiffs, as contained in their specification.
*349 The first relates to the sum of 12,746 dollars, the balance of divers bills issued by the Dedham bank, made payable at the Middletown bank, in Connecticut, which were transmitted by the cashier of the Middletown bank to Chickering, by his order, and were duly received by him in May or June 1823. The fact of the transmission of these bills and the delivery of them to Chickering, was proved to the auditor by the testimony of Coffin, who was sent to Connecticut by Chickering for the special purpose of receiving and delivering them. And by the testimony of Fisher, then clerk and since cashier of the Dedham bank, it was proved, that the whole amount of bills thus transmitted was 27,746 dollars, for which sum, by the direction of Chickering, the Middletown bank was credited in the books of the Dedham bank, but only 15,000 thereof were ever delivered into the bank by him, the residue, being the sum claimed in this specification, having been kept back, and never accounted for with the Dedham bank, except by the check of Chickering delivered to Fisher as a memorandum, which was deposited in a drawer in the bank ; upon which Chickering was charged with that amount by Fisher, in the books of the bank. Those bills not being found among Chickering’s effects when he absconded, and there being no evidence that they were ever delivered over to the bank, or cancelled or destroyed, the presumption is violent, that they have been converted by Chickering to his private use, and been put in circulation by him, so as to diminish to that amount the funds of the bank. This undoubtedly was a fraudulent act on the part of Chickering, and in direct violation of his duty as cashier ; for it was in that capacity that he received these bills, and he was officially, as well as morally, bound to deliver them into the bank, as part of the sum for which the Middletown bank had by his order been credited. For this sum therefore his sureties, as well as himself, are chargeable, unless for some of the reasons suggested in the argument, they are legally or equitably discharged.
And first, it is suggested that this delinquency grew out of an illicit transaction on the part of the directors and cashier of the Dedham bank, the issuing and circulating of bills of this description being expressly prohibited and made penal by *350 St. 1816, c. 91. In order to sustain this objection, it ought to be made to appear, that the bills thus embezzled were issued after the passing of that statute, it not having been before unlawful for a bank to issue bills, drafts, or notes, payable at any other place than their own bank. It is true that six or, seven years had elapsed, between the passing of the statute and the return of these bills from Connecticut to Chickering ; but as bank paper is known frequently to circulate a long time in the country without finding its way to the place where it is payable, it is not for the Court, without any evidence, to say that these hills were not issued before the 13th of December, 1816, which is the day of the enactment of the statute.
But if this matter had been made clear by evidence, we do not think it would follow that the plaintiffs’ remedy upon the bond would be defeated. It was unlawful to issue such bills after the passing of the statute, but it was not unlawful to receive them back into the bank after they had been in circulation. It was the proper duty of the cashier so to receive them, and having received them, if he re-issued them without the knowledge of the directors, or in any way converted them to his own use, he committed a breach of official trust.' On these bills, however unlawfully issued, the bank was liable, and without doubt it has since been obliged to redeem them. We think this transaction wholly disconnected from the illegality of issuing the bills, and that such illegality affords no manner of excuse to Chickering for purloining them, or of defence to his sureties. Had the charge against Chickering been, that he had neglected his duty in issuing these bills, or that he had destroyed them because intended to be issued contrary to law, the illegality of the intention to issue might have been a defence. But he is charged with having received them, after they had been in circulation, and been collected in Middletown to be returned to the bank by which they were issued, and, instead of placing them in the vaults, from whence it cannot appear they would ever have been again issued, putting them in circulation himself, or otherwise converting them to his own use. There seems to be noth *351 mg illegal in the transaction, so far as we can see into it, exc cpt in the conduct of Chickering.
In this view of the case, it seems to be unnecessary to go into a consideration of the authorities which have been cited on the question, whether the illegality of issuing the bills would prevent the plaintiffs from maintaining any action against Chickering, for any neglect of duty or any abuse of trust in relation to such transaction. If a person had forged any such bills, would he be acquitted because it was unlawful to issue them ?[1] Or if they had been stolen on their way to Connecticut, would it have been a defence that they were issued contrary to law ? It should be recollected that such bills are not made void by the statute, but on the contrary, have a force given to them beyond the mere terms of the contract. They are made payable at the place from whence they issued, and a refusal to pay on demand entitles the holder to four times the usual amount of interest. It should seem clear, therefore, that when taken up at the bank of Middletown by the funds of the Dedham bank, they became the property of the latter, and that the act of embezzling them by the cashier and putting them in circulation, was an official misdemeanour, for which he is answerable on his bond.
But it is urged, that the directors had the means of knowing of this defalcation before the absconding of Chickering- and in season to have secured themselves without resorting to the sureties ; so that on the ground of loches on their part, the sureties ought to be discharged.[2] We do not think the evidence on this point strong enough to warrant us in adopting that conclusion. The witness Fisher testified his belief, that they did not know of the existence of the check of Chicker *352 ing. They might have seen this large charge to him in the books, but considering the usual confidence placed in the cashier of the bank, and the frequent occasions for large sums to be in the hands of Chickering, to manage the necessary negotiations for the bank in Boston, it is not surprising they were not led to suspicion of one jn whose integrity all who were concerned in the bank appear to have reposed the highest trust. We are satisfied, therefore, that the plaintiffs have well made out their right to recover the sum claimed in this specification. And this without any deduction of the balance standing to Chickering’s credit in the bank books, for they have a right to retain that against the balance due from him on notes discounted on his stock. That balance arose in the usual course of transactions in the bank, and they always had a right to look to it as a security, in case of non-payment of his notes or failure of other security.
As to the second item in the specification, of 16,833 dollars, the circumstances are different, and require particular consideration. This sum composed a part of an impression of bills struck off in Philadelphia from plates of the old bills, to be used as a substitute for such of the bills of the same denomination as should be returned to the bank injured or defaced. Though made and signed by the president and cashier more than two years after the passing of the statute which prohibited the issuing of such bills, they bore date before the passing of the statute, and were intended to be issued m direct violation of it. They were not to make part of the ostensible funds of the bank, by being entered on their books, but were kept by themselves, in an iron chest wholly under the control of Chickering. They were not to be, and never were, noticed in the returns of the bank to the governor and council, which by law are required to state under oath the whole property and condition of the bank, and this contrivance was adopted by the directors at the suggestion, of Chickering the cashier. The whole of this transaction was fraudulent and illegal. It was intended to evade the law by giving these new bills the appearance, as well as the date, of the old ones which they should replace, and they were dealt with, not openly as the property of the bank, but *353 as a secret fund, by means of which a circulation might be continued of bills which could not be legally issued, because it would be always difficult, if not impossible, to detect the time of issuing them. In this transaction Chickering cannot be considered as acting within his duties as cashier, but as a broker or agent of the directors in an unlawful traffic, for which his sureties could not in any sense be liable.
If the directors imposed upon him this duty, so contrary to the fair management of the business o'f the bank, it is altogether beyond the contract of the sureties, which is only for the faithful performance of those trusts that properly and legally belong to the cashier of a bank. It is true that they are bound that he shall deliver over to his successor all books, papers, money, or other things committed to his care, belonging to the bank; but these bills cannot be considered as committed to him in his official character. They were not entered in the bank book, but were kept secretly by him. It may be doubted whether they were the property of the bank or corporation ; they were struck off with an unlawful purpose, and were never intended to make part of the funds of the bank. This is an affair between the directors and the stockholders. The directors have repeatedly sworn tó returns as containing all their bills in circulation and on hand, and these bills were omitted. It is impossible that sureties on the bond of a cashier, should be responsible for any embezzlement of bills coming into being in this unlawful way, kept apart from the funds of the bank, concealed from the public body to whom an exact account of every thing is required by law to be given, and surreptitiously put into circulation by the consent, if not the order, of the directors.
But it is asked, shall the innocent stockholders suffer for the mismanagement of the directors ? Certainly they must, for the directors are their agents, responsible to them for any breach of trust. They cannot, by requiring duties of a cashier not belonging to his office, throw a burden upon sureties wholly beyond the fair and legal meaning of the terms of their contract- If the directors should consent that the cashier should speculate with the funds of the bank in a way altogether inconsistent with the usual course of banking *354 business, the sureties cannot be holden to make good any loss which may accrue from such irregular transactions. Were it otherwise, suretiship would be too hazardous for any to engage in. Cases need not be cited, to show that sureties cannot be holden beyond the fair scope of their engagement, as intended by the parties when undertaken.[1] We think it very clear that this item of the specification must be rejected. Springfield Bank v. Merrick et al. 14 Mass. R. 322.
The third item respects the note of Butterfield, which was delivered to Chickering as an attorney to collect. It was collected by means of a draft on E. Hale, payable in October 1822, and which was paid when due, at the New Eng-lank bank, where the Dedham bank had credit for it. For this sum Chickering had credit given him by Fisher in the books of the Dedham bank. It seems to have been altogether the fault of the bank that they have lost this sum. Chickering became their debtor for this amount by their consent, and we can see no official misdemeanour in this act.
The other note, making the fourth item, appears to be entirely a transaction of Chickering as attorney of the bank, and not as cashier. The money was received by him on the note committed to him for collection, and he never received it as cashier.
As to the fifth item, there can be no pretence for charging this upon the surety, it being a balance of a debt due to the bank by Chickering, which he had secured as other stockholders did their debts. His transfer of the shares which he had pledged, was certainly not an officia act, but if done surreptitiously, was a mere personal fraud, wholly discon nected from his trust as cashier. The plaintiffs have rightfully treated this as a personal debt, by suing and recovering judgment against Chickering for it. We think however they have a right to avail themselves of the balance standing on the books in favor of Chickering, because in fact he was not their creditor to that amount, but largely their debtor.
The result of the whole is, that the plaintiffs must have *355 "udgment for the sum of 12,746.dollars, with interest ihjreon from the date of the service of the writ.

 Forging an instrument, which on the face of the indictment appears to be void if it were genuine, is not an indictable offence. People v. Shall, 9 Cowen, 778.
So where the circulation of bank notes for the payment of a certain sum is prohibited by statute, it is held in New York not to be a felony to utter and publish a forged note for that sum, though the note is not wholly void, but might, if genuine, be collected in another State. People v. Wilson, 6 Johns. R. 320; 3 Chitty’s Crim. Law, (3d Amer. ed.) 1038, n. (A), (B).

 See Hunt v. Bridgham, 2 Pick. (2d ed.) 585, notes; Crane v. Newhall, 2 Pick. (2d ed.) 614, note.

 See Boston Hat Manufactory v. Messing, 2 Pick. (2d ed.), 235, a 2 Miller v. Stewart, 9 Wheat. 680; Revised Stat. c. 36, § 27.